KATE O'GRADY, ADMINISTRATRIX, APPELLEE, V. UNION STOCK YARDS COMPANY, APPELLANT.

FILED OCTOBER 21, 1911. No. 17,099.

1. Master and Servant: INJURY: QUESTIONS FOR JURY. There are three principal questions of fact in this case which were by the trial court submitted to the jury. The evidence is examined and found to justify this action of the trial court.

2. Witnesses: COMPETENCY. A witness who is accustomed to handling all kinds of domestic animals may be permitted by the trial court to testify to the appearance and actions of a certain animal; it being a question for the jury to determine whether the animal was at the time specified "infuriated and dangerous."

3. Trial: INSTRUCTIONS. An instruction given by the trial court is found not to be erroneous, and requested instructions are found to have been properly refused.

4. Death: DAMAGES. In an action by a widow as administratrix in behalf of herself and five children to recover damages caused by the death of her husband, who was an active man in good health, 53 years of age, in regular employment at $60 a month, a verdict for $5,450 is not so excessive as to require a reversal of the judgment for that reason.

APPEAL from the district court for Douglas county: HOWARD KENNEDY, JUDGE. Affirmed.

Frank T. Ransom and Greene & Breckenridge, for appellant.

Smyth, Smith & Schall, contra.

SEDGWICK, J.

John O'Grady, while in the employ of the defendant company, was killed by an animal in the defendant's

yards, and the plaintiff, his widow, as administratrix of his estate, brought this action in the district court for Douglas county to recover damages on the alleged ground that the negligence of the defendant was the proximate cause of her husband's death. From a verdict in her favor, the defendant has appealed.

The principal question in the case is whether the verdict and judgment are supported by the evidence. It is insisted by the defendant that none of the issues of fact is supported by the evidence, unless it is the fifth and last one stated by the court. There is a main alley running east and west through the yards of the defendant company, and there are "chutes or alleys that run off the main alley north and south." The defendant received animals of all kinds from the railroad companies and others, and handled them in these yards. On the morning of the accident Bodell, who was in the employ of the defendant, and Wilson, who was an employee of a commission firm, were driving a number of hogs towards the west through this main alley. They were stopped by a gate which closed the alley, and saw on the other side of the gate the animal which afterwards killed O'Grady. These large gates are placed at intervals along the main alley. Their purpose seems to be to close the alley so as to turn animals into the side chutes which lead to the different pens. These side chutes also have gates which shut them off from the main alley. After they reached this gate Mrs. Jones, the foreman of the stock yards, came along this alley from the east, and inquired of Bodell why he stopped with the hogs. He was told by one of the men that the reason they stopped was because there was a cow on the other side of the gate. Jones thereupon said, "Open the gate and get her behind the gate," and was told by one of the men: "Do it yourself." Jones then attempted to open the gate so as to allow the men to pass with the hogs and at the same time to confine the cow behind the gate to keep her from passing also. He was unsuccessful in restraining the cow, which rushed through the gate and struck O'Grady, who

was in the alley on the east side of the gate. He was a "yardman." His general duties were in connection with "yarding stock from the chutes." The evidence does not show what, if anything, he was doing at the time, nor how he came to be at the scene of the accident. It appears that the employees of the company usually passed along this alley, and it seems to be conceded that O'Grady was in line of his duty at the time. He seems to have been attempting to pass through the gate, and just as he was opposite the gatepost was struck in the breast by the animal and crushed against the post. He was fatally injured and died a few days afterwards. It is conceded that there is no presumption that a domestic animal of this kind is vicious or dangerous, and that in order to hold the keeper of such an animal liable for negligence it must be shown both that the animal was dangerous and that the keeper knew it. The plaintiff's contention in this regard is that this animal had become infuriated for the time being and was dangerous on that account.

Both parties in their brief have quoted the third instruction given by the trial court as a correct statement of the questions of fact submitted to the jury upon which they were to find their verdict. That instruction is as follows: "You are instructed that under the pleadings and evidence in this case the burden of proof is upon the plaintiff to establish by a preponderance of the evidence each of the following propositions: (1) That the cow which caused the injury to said John O'Grady was at the time of said injury infuriated and dangerous to men on foot; (2) that the defendant's foreman Jones, at the time he opened the gate described in evidence, knew or ought to have known that said cow was at that time infuriated and dangerous to men on foot; (3) that the act of said Jones in opening said gate and striking said cow in attempting to imprison said cow behind said gate was, under all the circumstances as you find from the evidence they existed at that time, a negligent act; that is, such an act as a reasonably prudent person would not ordinarily have

performed under like circumstances; (4) that such negligence was the proximate cause of the injury and death of said O'Grady; and (5) that plaintiff was damaged thereby, and the extent of such damages. Accordingly, if you find that the plaintiff has established by a preponderance of the evidence each and every of the matters set forth in paragraphs 1, 2, 3 and 4, then your verdict should be for the plaintiff in an amount to be determined by you in accordance with instruction numbered 12 hereof, unless you further find that the injury to the decedent was in consequence of an assumed risk of his employment, as hereinafter explained. If, however, you find that the evidence on either of the foregoing propositions numbered 1, 2, 3, and 4 is evenly balanced or proponderates in favor of the defendant, or if you find that the injury to the decedent was in consequence of a risk assumed by him by virtue of his employment, then, in either of such events, your verdict should be for the defendant."

In considering the sufficiency of the evidence, it must of course be borne in mind that these five propositions of facts were properly stated by the court in its instructions, and that they and each of them are peculiarly questions for determination by the jury.

1. We think upon the first and second propositions submitted there can be no doubt that the evidence was sufficient to justify their submission to the jury. The witness Bodell, in company with Jones, the foreman of the yards, and another, passed along the alley a short time before Bodell returned with the hogs. They observed this animal at that time, and were both witnesses upon the trial. Bodell was called by the plaintiff and Jones by the defendant. Bodell had had experience in the yards; he had "handled lots of them." He described the animal as "nervous and fire in her eyes, and ready to make for you at any old time she would get a chance, or anybody." When these three men passed the animal in the alley, Bodell says: "I walked along close to the fence, and the cow stood on the south side of the alley; and I

hugged the fence on the north side. * * * She was then on the south side of the alley, and Jones and myself were on the north side. Ed Mohler was with us as we came east in the alley. * * * When Jones and Mohler and I came past the cow, we did not do anything except get out of her road." Mr. Jones testified: "As I came up, I did not think the cow appeared very bad, and was willing to take a risk of getting within 3 or 4 feet of her. I did not hit the cow hard enough to hurt anything, but I did strike the cow. * * * She started for me as if she had made up her mind she was coming, and I got out of the road. I made up my mind she was coming for me from the way she looked. Her appearance was just like all of them that are in that shape. Any downers, their eyes are not normal." The animal had fallen while being driven with others along the alley, and this appears to explain why she was alone in the alley at the time of the accident, and why the witness speaks of her as a "downer." Wilson, who was with Bodell and Jones when they passed the cow shortly before the accident, testified: "She was what I term a mad cow." While this evidence, and some other similar evidence found in the record, is not conclusive that the animal was infuriated and dangerous to men on foot, who might approach her in the alley, nor that the defendant's yard foreman knew, or that circumstances were such that he should know, that she was a dangerous animal, and is perhaps not very certain nor satisfactory upon either of those points, still it cannot be said that there is such an entire failure of evidence in those particulars as to require the court to determine them as questions of law. The jury having found for the plaintiff, we think it must be considered that the animal was dangerous and that the defendant had notice of that fact.

2. The third proposition submitted to the jury is more difficult. If Mr. Jones, acting for the defendant company, did what a reasonably prudent man having due regard for the safety of others would have done under the circum-

stances, the company is not chargeable with negligence. O'Grady was properly in the alley to the east of the gate. The opening of the gate by Jones gave opportunity for the animal to go through and attack O'Grady. There can be no doubt that this act in opening the gate was the proximate cause of the injury. Was this negligence on the part of Jones? He knew that the employees of the company were accustomed to travel through the alley, but it was not uncommon that an animal in a herd being driven along this alley should be thrown down or otherwise injured and become unmanageable and more or less dangerous. Such accidents were anticipated, a walk was constructed on the fence at the side of the alley, and employees were supposed to be able to keep out of the way of dangerous animals. When Jones began to open the gate, he did not know that O'Grady was near. The evidence is that this was not a "western animal," but what is called a "native," and native cattle are accustomed to men on foot, and as a rule "do not run at a man on foot. Once in a great while they do, but it is not usual. * * * There are 10 chutes between the place where the cow was unloaded and where the accident happened. The chutes are about 34 feet each, so that would be about 340 feet. * * * This cow * * * dropped behind the load at chute '17' and went down in the alley. * * * A man was trying to get her up, was off his horse and trying to get her up, and could not do so; that was at chute '17.' After that we yarded hogs right by her, passed her in the alley, and about 30 or 40 minutes after that the accident to O'Grady happened." The abstract shows this to be a part of Mr. Jones' evidence, and he further testified without contradiction: "This cow had not been out of the car more than a minute until I saw her fall, and I passed by her when she was lying there on the ground. The next time I saw her on her feet was when I opened the gate. This would be 30 or 40 minutes from the time she was unloaded, and I had passed the cow, I should say, two or three times. When she was

lying down she lay as quiet as could be. When I came to open the gate I came from the east, going toward the northwest. My attention had not been directed to this animal before coming to the gate. When I got up there the alley was blockaded, could not go any farther. The hogs were all shut off, one behind the other, and I went up to see what was the matter. I found the cow on the opposite side of the gate. She was then on her feet. I had not seen her between the time she was lying down and the time I got to the gate. * * * Just before the accident I had been down east in the alley and had come up the alley. I passed through this drove of hogs that Bodell was driving. I saw Bodell in the alley, and saw Wilson. Wilson was ahead of the hogs, and when I came up the alley I found for some reason that the hogs could not proceed any farther, and I went to see why. When I got up to this gate it was thrown across the alley, and I found Wilson there at the gate. On the opposite side of the gate was this critter. West of the cow there were other chutes opening into this main alley. Wilson got to the gate before I did, and I borrowed Wilson's whip. I borrowed his whip so as to get this cow behind the 14-foot gate and let the hogs go by. * * * I didn't figure on her being very bad, or I would not have taken the risk I did. I must have been within 3 or 4 feet of her myself. Q. What did you do? A. I borrowed a whip from this man Wilson that testified the other day, a short whip, probably 3 feet long. Q. Do animals of that breed and nativity as a rule submit to human control with a whip? A. Yes. Q. You may state whether or not the use of the whip upon animals in that situation is a common incident of the business there. A. It is the way we handle them all. * * * As I got the gate around, I might say, 5 feet from the post, she whirled at me. Of course, then I climbed up onto the gate, and the gate swung back to the fence. Q. State whether or not you had seen this animal run at anybody before that time. A. No, sir. Q. Do you remember coming down that alley 30 or

40 minutes before the accident, with Bodell and Mohler? A. No; I have no recollection of that; might have done it. Q. Do you recall any talk with Mohler wherein you said, in substance, to him, 'Look out for that cow, she will run at you'? A. No; I have no recollection of making that remark."

The plaintiff insists in the brief that it was "highly negligent for him to open the gate without any notice to those in the alley behind him. * * * If he had driven her west, he could have found a chute to the right or the left of him, within a few feet, to put her in, locked her up, opened the main artery of travel—the alley—and endangered nobody." The defendant contends that "if she was then or had been infuriated and dangerous to men on foot, Jones did not know O'Grady was around. Jones was responsible for delays in the work. It was his business to get that animal out of the way, and his attempt to do it was in the ordinary course of business and performed in the usual method."

We cannot say as a matter of law that reasonable men might not, from a consideration of the whole situation as disclosed by the evidence, reach different conclusions as to whether the defendants should have confined this animal, or should have given warning to those who might be endangered by opening the gate, or should have taken other precautionary measures for the safety of its employees. In this condition of the record, the law will not permit us to act upon our own conclusion as to the weight of the evidence. If the question is properly submitted, we must abide by the conclusion of the jury.

3. The defendant complains of the evidence of the witnesses Bodell and Wilson as to the appearance of the animal. It will be remembered that these two men, together with Jones, the yard foreman, passed by the animal shortly before the accident. Jones had an opportunity then and, as is clearly shown, at other times to observe the animal. Bodell was asked: "Describe, Mr. Bodell, her condition, as to her disposition, as to being mild,

13

fierce, untamed, or otherwise, as you saw it." The question was objected to as incompetent. The court ruled that the witness "might describe her appearance and actions." The witness answered: "Why, she looked nervous looking." The court refused to strike out the answer, and the witness was told to "go ahead," and answered: "Looked nervous looking, and in my way of describing it, I could tell you, because I have handled lots of them. Q. Describe her as you saw her. A. She was nervous and fire in her eyes, and ready to make for you at any old time she would get a chance, or anybody." This witness had been employed in these yards for some time. He was accustomed to handle all kinds of animals. The ruling of the court, of course, was correct that witness should be allowed to describe her appearance and actions. This apparently the witness attempted in good faith to do. We cannot say that the witness would be unable to determine from the appearance of the animal whether it was excited or "nervous" and ready to make an attack upon any one who came in its way. Whether the animal was in a condition to be controlled by ordinary means and whether there was reason to suppose that it would attack any person who came within its reach were matters of difficult investigation. If the witness' description of the appearance of the animal was incomplete and unsatisfactory, he might have been questioned further by either party. We cannot say, under the circumstances, that it was an abuse of discretion on the part of the trial court to refuse to strike out this evidence.

4. The defendant complains of the fourth paragraph of the instruction quoted, but there is no ground for this criticism. The jury could not have supposed that this instruction expressed the opinion of the court as to whether negligence had been established. The instruction criticised in *Olson v. Nebraska Telephone Co.*, 83 Neb. 735, was thought to be capable of such construction, and was therefore condemned. The last part of the fourth instruction given by the court appears to imply that "an

injury arising from a danger which was the result of negligence on the part of the defendant" would "be assumed by the plaintiff" if he knew and appreciated, or should have known and appreciated, the danger occasioned by such negligence. This language was prejudicial to the plaintiff, rather than the defendant, and would not therefore furnish ground for reversal in this case.

5. The defendant complains that the court refused to give instruction No. 2, asked by the defendant. This instruction, among other things, contained the statement that the defendant would not be liable, unless the foreman Jones at the time he opened the gate and allowed the animal to pass through knew "that O'Grady was there." This would be equivalent to an instruction for the defendant, since there was positive evidence that Jones did not at that time know that O'Grady was there, and there was no evidence to the contrary. If Jones knew that the employees frequently passed along this alley, and that there was a probability that some one or more of them were so situated as to be endangered by his act, it would not be necessary that he should also know that O'Grady, the man injured, was at that particular place at the time he opened the gate and permitted the animal to escape.

6. Instructions 3 and 4, requested by the defendant, were also properly refused by the court. It was not necessary that the jury should find that animals "of the breed and nativity of the one in question would not ordinarily submit to control by men on foot" in order to find for the plaintiff, as stated in the third request, nor that Jones knew where O'Grady was at the time, as stated in the fourth.

It is complained that the verdict is excessive. The verdict, as rendered by the jury, was for $9,164.17. The trial court required the plaintiff to remit $3,714.17, and, that having been done, entered a judgment upon the verdict for $5,450. The deceased was 53 years of age; his expectancy was nearly 19 years; he was earning $60 a

month; he left a wife and five children. If we say that he would probably devote two-thirds of his earnings to the support of his wife and children, they would in 19 years receive $9,120. The present value would be more than $5,000 at 6 per cent. We are required by our law to restrict the recovery to the pecuniary value lost to the family. This, however, is not necessarily limited to the dollars and cents which the deceased would probably have expended upon his family if he had lived. Care and maintenance of children mean more than this. The jury may properly consider "his services * * * in the superintendence and attention to, and care of, his family and the education of his chilren." *Chicago, R. I. & P. R. Co. v. Zernecke,* 59 Neb. 689. The question of damages is for the jury, and the court will interfere with their discretion only when their finding is clearly wrong.

The action of the trial court in determining the limitation of the discretion of the jury in fixing the amount of the recovery is approved, and the judgment is

AFFIRMED.

BARNES, J., dissents.